# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| STACEY BIRD, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) No. 6:13-cv-03352-NKL |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## ORDER

Stacey Bird appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits under 42 U.S.C. §§ 401-434. The Commissioner's decision is affirmed.

## I.  Background

Bird alleges she became disabled beginning on October 31, 2008, due to bipolar disorder, depression, anxiety, and panic attacks.

Ronald Glas, M.D., treated Bird from about 2004 to 2010. Bird saw him two or three times per year, except in 2007 and 2008 when she did not see him at all. She saw him once in 2009 with complaints of high blood pressure, increased stress and back pain. She also reported depression, anger and suicidal ideation at times. Dr. Glas prescribed mood medication and ordered an x-ray of her back. Tr. 258.

Bird saw Dr. Glas again in January 2010. She reported mood swings, insomnia, and paranoia, and told Dr. Glas she stopped taking her mood medication because it caused her legs to jump. Dr. Glas prescribed different mood medication, and anticipated that it would control Bird's symptoms. Tr. 264.

In February 2010, Dr. Glas prepared a letter "to whom it may concern," stating that Bird "has a medical need for disability" based on bipolar disorder and worsening symptoms over the previous six months, and that she was "unlikely to be employable." Tr. 267.

In a function report Bird completed in March 2010, Bird stated that she looks for work two days per week. She helps care for her live-in domestic partner, who is physically handicapped. Bird takes care of and plays with her dogs. Bird prepares her own meals and does laundry. She goes shopping for food and household items once a week. She plays on the computer daily and watches television. Tr. 196-202.

Dr. Glas completed a psychological impairment questionnaire in August 2010. He diagnosed bipolar disorder and episodes of psychosis; stated that Bird's prognosis was fair to poor; and listed her primary symptoms as mood swings, insomnia, paranoia, and hostility toward coworkers. Dr. Glas opined that Bird was mildly limited at carrying out simple instructions and moderately limited at carrying out detailed instructions; was markedly limited at maintaining attention and concentration and working with others; was capable of tolerating low work stress; and would be absent from work two to three times a month. Tr. 315-20.

At an August 2010 visit, Dr. Glas noted, based on Bird's self-report, that her "mood has generally been quite stable" and he observed a "fairly normal mood and affect." Tr. 322. Dr. Glas' assessment with respect to psychiatric issues was "bipolar, mixed in partial remission" and he continued Bird's current psychiatric medication. *Id.*

On November 8, 2011, Dr. Glas prepared another letter "to whom it may concern," stating Bird's limitations precluded her from maintaining full time employment as of October 2008. Tr. 351. On November 11, 2011, he prepared a letter, reiterating the opinions he offered in the August 2010 psychological impairment questionnaire. Tr. 320, 353.

Bird saw Richard Frederick, Ph.D., a one-time examining psychologist, for an evaluation in April 2010. She told Dr. Frederick she was applying for benefits because she could not make it through the day without crying. She said she had threatened a coworker in the past. She said she had no friends or social interaction, but also told him she was in a relationship. Bird said that in a typical day, she took her dogs out, borrowed her mother's car and looked for work, and watched television. She reported making a suicide attempt at age thirteen by taking an overdose of drugs, and denied any current intent to harm herself. She claimed her main problems were sadness and anger. She said she had never seen a psychologist. Tr. 289-90.

Dr. Frederick observed that Bird was alert and fully oriented; her speech was normal; her thinking was well-organized and coherent; and her mood was sad and dejected. Dr. Frederick noted that Bird did not appear overly anxious and that she engaged in the interview. Dr. Frederick assessed major depressive disorder, but opined that Bird's long-term emotional instability suggested borderline personality disorder, and assigned her a global assessment of functioning (GAF) score of 45. Dr. Frederick opined that Bird could understand, remember, and carry out moderately complex instructions; had minimal capacity to interact effectively in public situations; and had minimal capacity to adapt to changes in simple work situations. Tr. 290-92.

Geoffrey Sutton, Ph.D., a non-examining agency psychologist, reviewed Bird's file in May 2010. He assessed major depressive disorder and opined that Bird met Medical Listing 12.04. Dr. Sutton stated that Bird had marked limitations in her activities of daily living and social functioning, and moderate difficulties at maintaining concentration, persistence, or pace. Tr. 302-4.

At the October 2011 hearing before the ALJ, Bird testified that she had completed high school and a two-year culinary arts program. Tr. 43-44. She was diagnosed with bipolar

3

disorder and began taking medication for it in 2004. Tr. 54. She said she last worked in October 2008 as a head chef at a resort, but left her job after she snapped at her boss and held a knife to a coworker's throat. Tr. 44. She has low periods, usually lasting three to four days, once or twice per month, when she does not want to care for herself, get up, or talk to anyone. Tr. 51-52. She testified that she had had Medicaid until October 2010, and had no insurance, but Dr. Glas has not been charging her for visits in the last two years. Tr. 49. She has been in her current relationship with her domestic partner for three years. Tr. 52. She spends her time playing with her puppies, doing things around her house, watching television, and being with her partner. Tr. 50. To avoid snapping at people when she shops, she goes to the store late at night or early in the morning when there are fewer people in the store, or might ask her partner to shop. Tr. 54-55. She has been dealing with her mental health issues since childhood. Tr. 60. She has never seen a professional counselor. Tr. 48.

After the October 2011 hearing, the ALJ asked Bird to undergo a psychological evaluation, and she was referred to Cathy Grigg, Psy.D., who saw her in November 2011. Bird reported that she suffered from bipolar disorder. She said she had attempted suicide twice, once at age thirteen and once at age seventeen, and denied any previous mental health treatment. She said she typically goes to bed around 10 or 10:30 p.m., and gets up around 8 a.m., though she has insomnia. When she gets up, she takes her brother to work. She does some household chores, such as cooking, cleaning, and laundry. Tr. 333-35.

Dr. Grigg observed that Bird had intact insight and judgment, and was oriented and engaged during the interview process. Her immediate memory was impaired. Dr. Grigg administered a written psychological test, the Minnesota Multiphasic Personality Inventory-2-RF, but the test results were invalid due to over-reporting. Dr. Grigg assessed bipolar disorder,

4

dissociative disorder, and generalized anxiety disorder, and assigned a GAF score of 50-55. Dr. Grigg opined that Bird could understand and remember simple instructions, and concentrate and persist on simple tasks. Dr. Grigg also opined that Bird could interact in limited-contact situations with the general public, supervisors, and coworkers, and could adapt to moderately demanding work environments and manage funds independently. Tr. 335-38.

The ALJ concluded Bird had severe impairments of bipolar disorder and depressive disorder. The ALJ concluded Bird could not perform past relevant work, but was capable of performing light work with certain limitations, including no more than occasional interaction with coworkers and supervisors, and no interaction with the public. Tr. 17.

Bird argues that the ALJ should have determined she meets a medical listing; did not properly evaluate her credibility; and did not properly weigh the medical evidence.

**II.     Discussion**

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byers v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v.Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

**A.  The medical listing**

Bird bore the burden to show she met all requirements under Medical Listing § 12.04, affective disorder. *See Boettcher v. Astrue*, 652 F.3d 860, 863-64 (8th Cir. 2011); 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.04. The severity standards for listing-level impairments are high,

5

because "the listings [for adults] were designed to operate as a presumption of disability that makes further inquiry unnecessary[.]" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Listing 12.04 has A and B criteria, and to establish the required level of severity, both A and B must be shown. 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ determined Bird met A, but not B. To satisfy the B criteria, a claimant's mental impairment must result in at least two of the following effects in functional areas:

1. marked restriction of activities of daily living;
2. marked difficulties maintaining social functioning;
3. marked difficulties maintaining concentration, persistence, or pace; or
4. repeated episodes of decompensation, each of extended duration.

*Id*. The ALJ concluded that Bird satisfyied none of the paragraph B criteria.

The ALJ found that Bird had mild restriction in her activities of daily living. Bird borrows her mother's car and looks for work at least two days a week, and claims that afterwards, she cannot do anything and her partner must do everything. On the other hand, Bird reported that she helps care for her partner, who is physically disabled. Bird takes care of her dogs every day. She had earnings in the fourth quarter of 2008, the first quarter of 2009, and the second quarter of 2010. Although her earnings did not amount to substantial gainful activity, the earnings show she was able to work after October 31, 2008, the alleged onset date of her disability.

The ALJ found Bird had moderate restriction in her social functioning. Bird reports having no friends or social interaction, and Dr. Frederick opined that she appeared to have minimal capacity to interact effectively in public situations. But she has been in a romantic relationship that began around the time of her alleged onset date and is ongoing. In a typical day, spends time with loved ones. She states in her Adult Function Report that she talks, chats, and

plays with others either in person, or on the phone or computer every day.

The ALJ found Bird had mild restriction in her ability to maintain concentration, persistence, or pace. Bird claimed to not be able to follow written instructions very well, to quickly forget spoken instructions, and to need constant reminders. The ALJ noted, on the other hand, that Bird did not display any problems concentrating throughout the hearing. In her Adult Function Report, Bird indicated that she played video games and did puzzles, and used the computer four to five hours at a time.

Bird has never been hospitalized for mental health issues, and there was no evidence of repeated episodes of decompensation, each of extended duration.

Bird argues that the ALJ should have adopted Dr. Sutton's May 2010 opinion that she has marked restrictions in activities of daily living. The ALJ gave the opinion little weight because subsequent evidence conflicted with such restriction. For instance, in November 2011, Bird told Dr. Grigg that she drives her brother to work, cooks, cleans, and does laundry, and gave no indication of marked limitations in daily activities. Tr. 335. Substantial evidence supported the ALJ's finding that Bird had only mild limitations in her activities of daily living.

The ALJ found that Bird had moderate restrictions in social functioning, while Dr. Sutton found marked limitations. Bird stated on one hand that she had difficulty interacting with others, but as the ALJ noted, Bird developed a romantic relationship during the time of her alleged disability, and spent time with loved ones. Doc. 16 and 50. Additionally, Dr. Griggs opined that Bird has the capacity to interact in limited contact situations with the public, supervisors, and coworkers. Tr. 16 and 337-38. The ALJ considered the conflicting evidence, including evidence that Bird has not sought treatment from a psychologist, and substantial evidence supports the ALJ's finding that Bird had no more than moderate limitations in social functioning.

Finally, Bird argues that her primary care physician Dr. Glas, submitted a form suggesting that she was markedly limited in social functioning, and at maintaining concentration, persistence, or pace, Tr. 316-317, and that the ALJ erred in failing to address it. The ALJ was not required to discuss every piece of evidence in order to fairly and fully develop the record. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." (internal citation and quotation omitted)).

In any event, the form Dr. Glas filled out was a general one, not aimed at evaluation of the paragraph B criteria. Further, the majority of the boxes Dr. Glas checked indicated no more than mild or moderate symptoms, inconsistent with findings of marked limitations under the paragraph B criteria of social functioning, and ability to maintain concentration, persistence, or pace. For example, Dr. Glas checked boxes indicating mild limitation in the ability to maintain socially appropriate behavior and to adhere to basic standards of cleanliness; to carry out simple one- or two-step instructions; and to perform activities within a schedule. Tr. 316-17. He indicated moderate limitations in the ability to interact appropriately with the general public, and to carry out detailed instructions. *Id*.

The ALJ's decision that Bird did not meet Medical Listing 12.04 is based on substantial evidence.

**B. Credibility evaluation**

Bird argues that in discounting the credibility of her testimony, the ALJ failed to perform a proper credibility analysis. Credibility is "primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009) (internal quotation and citation omitted). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the

reviewing court] will normally defer to the ALJ's credibility determination." *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010) (internal quotation and citation omitted).

The ALJ's decision reflects, in detail, that he performed the appropriate two-step credibility evaluation. Tr. 17-23 (citing 20 C.F.R. § 404.1529, *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), SSR 96-4p, and SSR 96-7p). For the first step, the ALJ considered whether there was an underlying, medically determinable physical or mental impairment that could reasonably be expected to produce Bird's symptoms and, based on the objective evidence in the record, concluded that there was. The ALJ then considered the intensity, persistence and limiting effects of Bird's symptoms to determine the extent to which they limited her functioning. He concluded Bird was not credible, based on her limited treatment, inconsistent statements, and receipt of unemployment benefits, and the lack of supporting objective medical evidence.

The *Polaski* factors that the ALJ considered included*:* (1) the claimant's daily activities; (2) duration, intensity, and frequency of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaint. 739 F.3d at 1322. 20 C.F.R. § 404.1529(c)(2) (the agency will consider "objective medical evidence" when evaluating symptoms).

Bird does not disagree with the ALJ's conclusion that her mental health treatment was limited. She argues, however, that she was being treated with medications and "[t]here typically are no other types of treatment for mental illness," or was being treated conservatively. Doc. 11, pp. 18-19. A claimant's treatment should be considered when evaluating the claimant's symptoms, 20 C.F.R. § 404.1529(c)(3)(v), and Bird's treatment supports the conclusion that her symptoms were not as disabling as claimed. Bird never saw a mental health specialist, nor was

she ever hospitalized for mental health issues. Her primary care physician, Dr. Glas, prescribed psychiatric medication for her and saw her two or three times per year, at most. She could have seen him more frequently, if needed, because she had Medicaid benefits for a period of time, and Dr. Glas had not charged for visits in the last two years. Further, in a March 2008 treatment note, Dr. Glas does not mention a mental health impairment, nor does he prescribe psychiatric medication. In a December 2010 treatment note, he prescribed a psychiatric medication and noted that he expected it to control Bird's symptoms. Under the circumstances, the limited mental health treatment she received supports the ALJ's determination.

Bird argues that the ALJ gave undue weight to inconsistencies in the record. A claimant's subjective reports may be disbelieved due to "inherent inconsistencies or other circumstances." *See Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004). Here, Bird told Dr. Grigg, whom she saw for a psychological examination, that she hears voices, but denied psychotic symptoms to another examiner, Dr. Frederick. Bird told Dr. Grigg, but not Dr. Glas or Dr. Frederick, that she sleep walks. Bird told Dr. Grigg she attempted suicide twice, and told Dr. Frederick she attempted it once. As for daily activities, Bird claimed that her partner "had to do everything" some days, but also testified that her partner was physically handicapped and that she had to help out. Tr. 196-97. The ALJ noted that even if Bird was not intentionally making misstatements, the inconsistencies showed her statements were unreliable, Tr. 21, a conclusion supported by substantial evidence.

Bird also argues that the ALJ should not have considered Bird's continued search for work and collection of unemployment benefits—after her alleged onset date—to be inconsistent with her claim of disability. But "the acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability," even though an

ALJ cannot base an adverse credibility finding on such fact alone. *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998). Bird claims she became disabled on October 31, 2008, the record shows she received unemployment benefits after leaving her job in 2009 and was actively looking for work. Such facts cast doubt on her credibility and the ALJ could properly consider them. And as the ALJ's decision shows, the adverse credibility finding was not based on those facts alone.

Finally, the ALJ found that objective medical evidence in the record conflicted with Bird's allegations of disabling limitations. Contrary to Bird's argument, the ALJ did point out objective evidence, such as Bird's over-reporting of symptoms on one of the psychological tests administered by Dr. Grigg, which invalidated Bird's test results.

### C. Weight of the medical evidence

Bird argues that the ALJ erred in giving little weight to the opinion of Bird's treating physician, Dr. Glas, and a one-time examining consultant, Dr. Frederick, and giving great weight to another one-time examining consultant, Dr. Grigg. The ALJ's findings were properly supported by the relevant evidence in the record.

Although a treating physician's opinion is generally entitled to substantial weight, the opinion "does not automatically control in the face of other credible evidence on the record that detracts from" it. *Brown v. Astrue,* 611 F.3d 941, 951 (8th Cir. 2010). The opinion may be afforded less weight when inconsistent with or contrary to other substantial evidence. *Edwards v. Barnhart,* 314 F.3d 964, 967 (8th Cir. 2003). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation omitted). *See also Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005)

11

(ALJ could properly discount a therapist's RFC when contemporaneous treatment notes showed that the claimant had "improved" and was "fair"). An ALJ decides how much weight to afford each medical opinion. *See Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) ("It [is] the ALJ's task to resolve conflicts in the evidence.").

Dr. Glas' opinion that Bird's limitations were so severe as to preclude her from maintaining full time employment was unsupported by clinical findings and inconsistent with the treatment notes, including Dr. Glas'. Although Dr. Glas opined that Bird's limitations were severe, he provided limited treatment, only seeing Bird two or three times per year, and he did not refer Bird to a mental health specialist, such as a psychologist, for treatment. There is substantial evidence to support the ALJ's conclusion.

Bird also argues that the ALJ erred in giving little weight to Dr. Frederick's assessment. In April 2010, Dr. Frederick, a one-time examining consultant, opined that Bird could understand, remember, and carry out moderately complex instructions, and interact effectively in public situations, but not in private. Tr. 291-92. The ALJ found that these limitations appeared to be based on Plaintiff's subjective complaints. Tr. 22, 289. Additionally, more recent evidence in the record conflicted with Dr. Frederick's assessment, including Dr. Grigg's opinion. There is substantial evidence to support the ALJ's conclusion.

Finally, Bird argues that the ALJ erred by relying on Dr. Grigg's opinion. But the opinion was supported by the medical evidence in the record. Tr. 23. Dr. Griggs examined Bird and opined that Bird could understand and remember simple instructions, concentrate and persist on simple tasks, interact in limited contact situations with the general public, supervisors, and coworkers, adapt to moderately demanding work environment, and manage funds independently. These findings were consistent with Bird's reported abilities to perform activities of daily living,

including caring for her physically handicapped partner. Tr. 197, 322, 335, 336. The ALJ's decision to give Dr. Griggs' opinion great weight is supported by substantial evidence in the record.

### III.     Conclusion

The Commissioner's decision is affirmed.

> s/ Nanette K. Laughrey
> NANETTE K. LAUGHREY
> United States District Judge

Dated:  September 5, 2014
Jefferson City, Missouri